Hilary DAVIS, individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

William J. PAGE, Jr., etc., et al., Defendants,

Circuit Judges Dixie Herlong Chastain, etc., et al., Defendants-Appellants.

No. 78-2063.

United States Court of Appeals, Fifth Circuit.*

Sept. 15, 1983.

Certiorari Denied Jan. 9, 1984. See 104 S.Ct. 735.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Sidney H. McKenzie, III, Asst. Atty. Gen., Tallahassee, Fla., for defendants-appellants.

Michael R. Masinter, Miami, Fla., for plaintiffs-appellees.

Robert L. Walker, San Francisco, Cal., for amicus Nat. Legal Aid & Defender Ass'n, Nat. Center for Youth Law.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before GODBOLD, Chief Judge, TUTTLE, BROWN, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON JR., HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, THOMAS A. CLARK, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.**

PER CURIAM:

In our prior en banc decision in this case we held that the due process clause of the fourteenth amendment requires the state of Florida to provide counsel to indigent parents whose children are the subject of dependency proceedings. *Davis v. Page,* 640 F.2d 599 (5th Cir.1981). The United States

---

** Judge Peter T. Fay was a member of the Court that heard oral argument but did not participate in the decision of this case. Judge Sam D.

Johnson recused himself and did not participate in the consideration or decision of this case.

Supreme Court granted certiorari, vacated the judgment, and remanded the case to us for consideration in light of *Lehman v. Lycoming County Children's Services Agency,* — U.S. ——, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). *Chastain v. Davis,* 458 U.S. 1118, 102 S.Ct. 3504, 73 L.Ed.2d 1380 (1982). Since our prior en banc decision, the Supreme Court has also decided *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). *Lehman* held that federal habeas corpus jurisdiction could not be invoked to challenge state-court judgments involuntarily terminating parental rights. *Lassiter* held that due process requires only a case-by-case determination whether indigent parents should be provided with counsel in parental termination proceedings, rather than the appointment of counsel in all instances. We hold first that *Lehman* does not deprive us of jurisdiction in this case. Second, we hold that *Lassiter* requires that the right to counsel in Florida dependency proceedings be determined on a case-by-case basis. Finally, based on *Lassiter,* we hold that the district court should have dismissed the claim for relief now before us. Thus, we reverse the judgment of the district court and remand the case for the court to dismiss that claim.

### I.

Because the facts of this case have been set forth in three prior opinions, *Davis v. Page,* 442 F.Supp. 258 (S.D.Fla.1977), *aff'd in part and remanded,* 618 F.2d 374 (5th Cir.1980), *aff'd in part and rev'd in part on reh'g en banc,* 640 F.2d 599 (5th Cir.1981), we state the essential facts briefly. On March 4, 1976, the Circuit Court of Dade County, Florida, adjudicated Carl T. Davis a dependent child without providing his indigent mother, Hilary Davis, counsel. The court placed the child in the temporary custody of the State Department of Health and Rehabilitative Services (DHRS). After petitioning the Florida Supreme Court unsuccessfully for a writ of habeas corpus, Ms. Davis brought this suit.

Davis separated her complaint into two distinct counts against two separate groups of defendants. Count I sought a writ of habeas corpus to release the Davis child from the custody of DHRS and named DHRS officials as defendants. Count II sought declaratory and injunctive relief in favor of a class of indigent parents who were not or who would not be provided counsel in dependency proceedings, and named as defendants the judges then assigned to the Juvenile and Family Division of the Dade County Circuit Court.

The district court granted summary judgment in Davis' favor on both counts after certifying a class in count II. The DHRS officials did not appeal. The state judges appealed, and in our prior panel and en banc decisions we essentially affirmed the district court's decision. We now reconsider these decisions in light of *Lehman* and *Lassiter.*

### II.

First, we must determine the effect of *Lehman* on our prior en banc decision. In *Lehman* the Supreme Court held that federal habeas corpus jurisdiction could not be invoked to challenge state court judgments involuntarily terminating parental rights. In the case at bar, habeas jurisdiction was invoked, but in support only of count I. The count I defendants, DHRS officials, did not appeal the district court's judgment. The only count involved in this appeal was count II. Count II was based on 42 U.S.C. § 1983 (1976 & Supp. V 1981). The district court took jurisdiction of count II pursuant to 28 U.S.C. § 1343(a)(3) and (4) (1976 & Supp. V 1981). Consequently, this appeal does not involve habeas jurisdiction and *Lehman* is inapplicable.

The Supreme Court's remand to us for reconsideration in light of *Lehman* is nevertheless understandable. Our prior en banc opinion could be read as based in part on habeas jurisdiction. We take this opportunity to clarify any confusion that opinion may have caused. Only the count II defendants, the state judges, appealed the district court's decision. Because the count I defendants did not appeal, the question of

the applicability of habeas jurisdiction was not before us. We proceed to decide Davis' section 1983 claim against the state judges, which is unaffected by *Lehman.*

### III.

We now consider whether our prior en banc decision survives *Lassiter.* In our prior decision we held that due process requires the appointment of counsel for indigent parents in all Florida dependency proceedings. In *Lassiter* the Court held that due process requires only a case-by-case determination whether counsel must be appointed for indigent parents in state termination proceedings. The Court expressly rejected the notion that due process requires the appointment of counsel for indigent parents in all termination proceedings. 452 U.S. at 31, 101 S.Ct. at 2162. The question presented is, therefore, whether a proceeding in which a child is adjudicated a dependent is distinguishable from a proceeding in which parental rights are terminated, for purposes of the right to counsel under the due process clause. We apply the *Lassiter* analysis to dependency proceedings to resolve this question.

The Court in *Lassiter* began its analysis by drawing from prior cases "the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty." 452 U.S. at 26–27, 101 S.Ct. at 2159. Thus, in *Lassiter* the presumption was against the appointment of counsel. Similarly, in this case Ms. Davis' physical liberty was not at stake. Therefore, the presumption was against the appointment of counsel. This case and *Lassiter* are not distinguishable as regards the presumption against the appointment of counsel.

The Court's analysis next focused on the balancing test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), which requires evaluation of "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Lassiter,* 452 U.S. at 2159, 101 S.Ct. at 2159. In analyzing the private interests,

the Court first recognized the extreme importance of the parental interest at stake in a termination proceeding:

> This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to "the companionship, care, custody and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Here the State has sought not simply to infringe upon that interest but to end it. If the State prevails, it will have worked a unique kind of deprivation. A parent's interest in the accuracy and injustice of the decision to terminate his or her parental status is, therefore a commanding one.

452 U.S. at 27–28, 101 S.Ct. at 2160 (citations and footnote omitted).

We must determine whether the parental interest asserted in a dependency proceeding is any stronger than the "commanding" interest the Court has found in a termination proceeding. In the latter, the interest is in the complete termination of parental rights. In fact, in *Lassiter* the Court relied on the finality of the termination decision to support its holding that a commanding interest was at stake: "Here the State has sought not simply to infringe upon [the parents'] interest but to end it. If the State prevails, it will have worked a unique kind of deprivation." *Id.* (citations omitted).

In contrast to the complete and irrevocable termination present in *Lassiter,* the parental interest asserted in a Florida dependency proceeding will usually be in the temporary custody of the child. As we noted in our prior en banc decision:

> Once a child has been adjudicated dependent the court may (1) place the child in his own home or the home of a relative under protective supervision; (2) commit the child to a licensed child-care agency; (3) commit the child to the temporary legal custody of DHRS; or (4) permanently commit the child to DHRS or a

licensed child-placing agency. Fla.Stat. § 39.41(1).

640 F.2d at 601 n. 2.

Thus, although permanent commitment of the child is a possibility, it is also a possibility that the child will remain in his own home or in the home of a relative. The parental interest at stake certainly becomes greater as the deprivation approaches permanency. Supervision of the child in his own home does not amount to the "unique" type of deprivation present in *Lassiter.* As the Supreme Court noted in discussing New York termination proceedings in *Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (footnote omitted):

> If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedure.

The potentially disparate parental interests at stake in Florida dependency proceedings militate in favor of greater flexibility concerning the appointment of counsel, rather than a rigid rule requiring counsel in all cases. Under a flexible approach, the state judge can identify the parental interest at stake before the proceedings commence, for example the court can determine whether complete parental termination is a possibility, and then decide whether to appoint counsel. Therefore, analysis of the parental interest at stake in dependency proceedings compared to that asserted in termination proceedings reveals a balance weighted even more heavily in favor of a case-by-case approach in this case than in *Lassiter.*

The Supreme Court next analyzed the second prong of the *Mathews* test: the state's interest. First, it noted that: "Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision." 452 U.S. at 27, 101 S.Ct. 2160. The Court then recognized the state's interest in an economic and efficient procedure. The Court concluded that although this latter interest was legitimate, it was not significant enough to overcome the important parental interest at stake. In this case, the state's interest is identical to the state interest asserted in *Lassiter.* The state desires an accurate and just decision that can be made as economically and as efficiently as possible. Therefore, this case is indistinguishable from *Lassiter* regarding the second prong of the *Mathews* test.

The Court next applied the third prong of the *Mathews* test to determine "the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel." 452 U.S. at 28, 101 S.Ct. at 2160. The Court reviewed the North Carolina termination procedures, which provided, *inter alia,* that only certain persons or agencies could file a petition to terminate parental rights; that facts be described in the petition sufficient to warrant a finding that one of the grounds for termination existed; that the parent be notified of the petition and be given 30 days to respond; that if the parent's answer denies a material allegation raised in the petition, a lawyer must be appointed as guardian *ad litem* for the child at a hearing to resolve any material issues; that the court order a hearing even if the parent fails to respond to the petition; that the court find facts based on clear, cogent, and convincing evidence; and that any party could appeal within ten days of the hearing. The Court then acknowledged that based on the circumstances surrounding the hearing—which might include, for example, expert medical and psychiatric testimony, and parents with little education—an uncounselled parent might be overwhelmed by the proceeding. The Court thus recognized that the risk of an erroneous deprivation because of lack of counsel might be high in some cases.

Like the North Carolina termination statute, the Florida dependency statute has various provisions designed to ensure a correct decision: a petition can be filed only by the state attorney, an authorized agent of

the division of youth services or of the division of family services, or a "person who has knowledge of the facts alleged or is informed of them and believes that they are true," Fla.Stat.Ann. § 39.05(2) (West 1974); the petition must be in writing and must be signed by the petitioner under oath stating his good faith in filing the petition, *id.* § 39.05(3); a written answer to the petition need not be filed by any party, including the parent, but any matters may be pleaded orally before the court, *id.* § 39.07; once a petition has been filed, the court may order the child to undergo a physical or psychological examination with the parent or child's consent, *id.* § 39.08; an adjudicatory hearing is held as soon after a petition is filed as is practicable, *id.* § 39.09(1)(a); the hearings are conducted by a judge without a jury; the rules of evidence in civil cases are applied; the state, represented by counsel, must prove its case by a preponderance of the evidence, *id.* § 39.09(1)(b); once a child has been adjudicated a dependent, the court must hold a disposition hearing, at which time it considers a predisposition study presented by an agent of the division of youth or of family services, *id.* § 39.-09(3); finally, the child or parent may appeal the dependency adjudication, *id.* § 39.-14(1). We believe these provisions, although differing in some respects from the North Carolina termination procedures, provide enough protection against the risk of erroneous determinations that we cannot say that indigent parents must be appointed with counsel in all Florida dependency proceedings.

In *Lassiter* the Court expressly recognized that termination proceedings may present complex issues involving medical and psychiatric testimony. The same is true of dependency proceedings. Similar to the situation in termination proceedings, an uncounselled parent in a Florida dependency proceeding might be overwhelmed by the circumstances. Nevertheless, there is no reason to believe that there is a greater risk of erroneous deprivation in a Florida dependency proceeding than the potentially great risk the Supreme Court recognized in North Carolina termination proceedings.

Thus, the case cannot be distinguished from *Lassiter* on this basis.

Finally, the Court balanced the *Mathews* factors and weighed them against the presumption that there is no right to appointed counsel in the absence of a potential deprivation of physical liberty. The Court summarized the factors as follows:

> [T]he parent's interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounselled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

452 U.S. at 31–32, 101 S.Ct. at 2162. The Court held that whether these factors are sufficient to overcome the presumption depends on the relative weight of the factors in each individual case:

> If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel.

*Id.* The Court thus held that due process was not so inflexible as to require the appointment of counsel in every case.

We believe the *Mathews* analysis leads to the same result in this case as it did in *Lassiter*. There is no material distinction between this case and *Lassiter* under any of the three *Mathews* prongs. The parent's interest is an extremely important one. The state's pecuniary interest is relatively weak. And the risk of an erroneous deprivation is potentially high. *Lassiter* holds that these factors must be weighed against

the presumption against counsel on a case-by-case basis. We are bound by this holding.

### IV.

We need not apply the *Lassiter* balancing test to Davis' individual case because she was granted the habeas corpus relief she sought in count I; and the count I defendants did not appeal. All that is before us is the class claim in count II of Davis' complaint. In this count, Davis asked for prospective declaratory and injunctive relief in favor of a class of indigent parents prohibiting the state judges of the Juvenile and Family Division of the Dade County Circuit Court from conducting dependency proceedings without appointing counsel for such parents in all cases. The very nature of the relief Davis requested in count II is inconsistent with the holding of *Lassiter.* *Lassiter* rejected a broad prophylactic approach to the appointment of counsel in cases such as the one before us, and instead adopted a case-by-case analysis. Thus, *Lassiter* makes any claim for class relief impossible in this case by removing the commonality of fact necessary to the maintenance of a class action. *See* Fed.R. Civ.P. 23(a)(2).

### V.

Our function is not to question the wisdom of the *Lassiter* opinion, but rather to apply it straightforwardly. So applied, the conclusion is inescapable that *Lassiter* requires a case-by-case analysis of the right to counsel for indigent parents in Florida dependency proceedings. *Lassiter* has completely superseded the prior opinions in this case, and it precludes the relief Davis requested in the only count of her complaint before us on appeal. Thus, we REVERSE the judgment of the district court and REMAND for the district court to enter judgment for the defendant judges on count II of the complaint.*

TJOFLAT, Circuit Judge, with whom BROWN, CHARLES CLARK, HILL, HENDERSON, HATCHETT, GARWOOD and JOLLY, Circuit Judges, join, specially concurring:

Although I concur in the judgment of the court to reverse and remand count II to the district court to enter judgment for the defendant judges, I would order the entry of that judgment for different reasons. I believe that Davis' count II claim against the state judges for declaratory and injunc-

---

* We note that even if one believes that *Lassiter* does not control this case, the practical problems, arising from concerns of federalism, inherent in enjoining state judges from conducting dependency proceedings without providing indigent parents with counsel, must not be ignored. The Supreme Court has recognized such concerns in two recent opinions: *Lehman v. Lycoming County Children's Services Agency,* 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982), and *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). *Lehman,* as we have noted, held that federal habeas corpus jurisdiction could not be invoked to challenge state-court judgments involuntarily terminating parental rights. *Sims* held that federal courts must abstain from interfering in pending state proceedings in which the state has taken temporary custody of children to prevent abuse by their parents. Both of these decisions recognize the problems that arise when federal courts interfere with state determinations involving parental rights.

If we were to affirm the district court's decision ordering coercive relief in favor of a class in this case, the effect of our holding would be to circumvent *Lehman* and *Sims.* For example, if the state court in a different termination proceeding decided that a parent was not indigent, the parent would immediately move in federal court for coercive relief against the state judge by asking the federal court to issue an order requiring the state judge to show cause why he should not be held in contempt. If the federal court during the pendency of the state dependency proceeding issued such a show cause order, this order would violate the holding of *Sims.* If the federal court were to issue such an order after the dependency proceeding had concluded, the order would violate the spirit of *Lehman's* holding by providing the type of collateral review that case held invalid. The question of whether a parent is truly indigent is only one example of various questions a state judge might have to decide, and that would be subject to immediate collateral federal review under the type of relief the district court fashioned in this case. Given the Supreme Court's sensitivity to federalism concerns in this area, the practical problems involved in issuing such relief are prohibitive.

tive relief *never* presented a case or controversy. As the per curiam opinion states, the district court certified a class and granted all the relief Davis requested under count II. In deciding whether Davis was an adequate class representative, the court should have first decided whether Davis' individual claim for relief against the judges presented a case or controversy. *See East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403–04, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) ("[T]hese plaintiffs lacked the qualifications to be hired as line drivers. Thus, they could have suffered no injury as a result of the alleged discriminatory practices [against line drivers], and they were, therefore simply not eligible to represent a class of persons who did allegedly suffer injury.") (footnote omitted); 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.04[2], at 120–27 (2d ed. 1982). Specifically, the court should have determined whether it could have ordered any relief against the Dade County circuit judges that would have been of any benefit to Davis. As Chief Justice Hughes recognized in *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937): "[The controversy] must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character ...." Because the district court's grant of declaratory or injunctive relief against the judges would have been of no benefit to Davis, I would hold there was no case or controversy between Davis and the judges. Therefore, I would not decide the merits of the purported class claim.

The wrong alleged in count II was that judges had violated the constitutional rights of Davis and other indigent parents and were continuing to violate the constitutional rights of indigent parents by their practice of not appointing counsel in dependency proceedings. The district court could have granted no remedy of benefit to Davis against the judges for the alleged violation in her case, however, because the dependency proceeding involving her child had concluded.[1] At that point, any claim Davis may have had against the judge in her case or the other judges assigned to the Juvenile and Family Division for declaratory and injunctive relief was moot. *See C & C Products, Inc. v. Messick,* 700 F.2d 635, 636 (11th Cir.1983) (if events preclude the grant of effective relief, case is moot). Davis did not allege that she might be a defendant in future dependency proceedings.[2] Neither an injunction mandating that the judges appoint counsel to indigent parents in the future nor a declaration that the judges' practice of denying counsel to indigent parents was unconstitutional would have been of any benefit to Davis because the proceeding involving her child had concluded.[3]

One might argue that a declaration of the unconstitutionality of the judges' practice

1. Thus, this is not a case in which one in Davis' position brought a federal suit for declaratory and injunctive relief during the state dependency proceeding. Presumably, no problem of case or controversy would arise in that context. Other barriers to relief would most likely arise, however, including, most notably, abstention. *See Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979).

2. Thus, Davis' claim did not fall within the "capable of repetition yet evading review" exception to the mootness doctrine. *See C & C Products, Inc. v. Messick,* 700 F.2d 635, 637–38 (11th Cir.1983). If count II of Davis' complaint had presented a live case or controversy against the judges at the time her suit was filed and at the time the class was certified, the fact that Davis' individual claim might have become moot would not have mooted the case because the interests of the class would still have been live. *See Sosna v. Iowa,* 419 U.S. 393, 398–403, 95 S.Ct. 553, 556–59, 42 L.Ed.2d 532 (1975). But this case is distinguishable from *Sosna* because Davis' complaint never presented a case or controversy against the judges. Therefore, the district court should not have certified the class. *See Sosna,* 419 U.S. at 402, 95 S.Ct. at 559 ("There must ... be a named plaintiff who has [an article III] case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23 ...." (footnote omitted).

3. Count II of Davis' complaint could not have been interpreted to have asked for damages. Furthermore, the judges would have been immune from damages liability. *See Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978).

would have benefited Davis because it might have cast doubt on the constitutionality of the judgment under which DHRS had custody of her child.[4] This argument does not, however, respond to the observation that Davis alleged no case or controversy against the judges because she sought no relief from them. Even if DHRS had been joined as a party defendant in count II of Davis' complaint,[5] the only relief Davis requested or could have obtained for her benefit was the return of her child from DHRS. Davis could have obtained no relief from the judges.[6] We should not allow an indirect lawsuit aimed at only one party to be brought against different parties, who are powerless to take any action of benefit to the plaintiff. A case or controversy must exist between the plaintiff and each defendant. See, e.g., Northern Virginia Women's Medical Center v. Balch, 617 F.2d 1045, 1049 (4th Cir.1980). Because Davis' controversy was only with DHRS, we should not consider any possible effect relief entered against the judges might have had on DHRS.

Firmly established case law recognizes that once a proceeding has ended and there is no sufficient allegation that the petitioner may again be involved in a similar proceeding, no case or controversy exists between the petitioner and the judge who had presided over the proceeding. In O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), nineteen named individuals brought a civil rights action, individually and on behalf of a class of citizens of Cairo, Illinois, against, among others, a magistrate and an associate judge of the local county circuit court. The suit alleged that the defendants had engaged in certain unconstitutional practices affecting the individuals and the class, including illegal bond-setting, sentencing, and jury-fee practices. The Court held that petitioners had failed to establish a case or controversy against respondents for equitable relief because it was too speculative whether petitioners would be subject to the alleged illegal practices in the future. The Court held: "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." Id. at 495–96, 94 S.Ct. at 676; see also City of Los Angeles v. Lyons, —— U.S. ——, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Although in the case at bar Davis was suffering the continuing adverse effect of being deprived of her child, at the time she brought her suit for declaratory and injunctive relief it was DHRS who was responsible for this circumstance. Davis' claim for injunctive and declaratory relief against the judges had passed.

In Slavin v. Curry, 574 F.2d 1256, modified, 583 F.2d 779 (5th Cir.1978), Slavin brought an action under 42 U.S.C. § 1983 alleging that a state judge and others had conspired to deprive him of due process and equal protection by framing him on state criminal charges. Slavin was convicted of those charges in a trial before the state judge. His conviction was reversed on appeal. Slavin alleged that the judge took certain acts throughout his trial to rig the case against him, including ordering court reporters to alter the transcript of his trial to make it more likely his conviction would be upheld on appeal. He sought a declaratory judgment that the judge had infringed on his constitutional rights by these actions.

---

4. Such a declaration would not necessarily impugn the constitutionality of the proceeding involving the Davis child. Conceivably, a court could decide that although Davis' proceeding on the whole satisfied due process, nonetheless the likelihood of due process violations occurring in other cases because of the deprivation of counsel was so great that a prophylactic rule was needed to prevent the withholding of counsel.

5. Davis never mentioned DHRS as a party in count II. This does not reflect an oversight on Davis' part, but rather reflects a recognition of the separate nature of counts I and II.

6. It is hard enough to determine what relief Davis sought from the judge who presided over the dependency proceeding involving her child. It is even harder to fathom what relief she sought from the other judges.

In dismissing the complaint against the judge, the district court relied in part on the absence of an active controversy between Slavin and the judge. The court of appeals first recognized "that courts will grant declaratory relief only if there is 'a substantial controversy of sufficient immediacy and reality between parties having adverse legal interests.'" 574 F.2d at 1264 (quoting *Wolfer v. Thaler,* 525 F.2d 977, 979 (5th Cir.1976)). The court then tried to determine the present stage of the state criminal proceedings against Slavin. It recognized that a state jury had convicted Slavin, but that this conviction had been reversed on appeal. It noted that Slavin had been reindicted, but it did not know whether any further proceedings had occurred. The court held:

> In this case, whether there is . . . a substantial controversy will depend upon Slavin's current condition. If he has not been retried on the same charges, these defendants may continue to infringe his constitutionally guaranteed rights. If that possibility were proved, the district court is not foreclosed from enjoining the judge and others from continuing their conduct. It may be, however, that Slavin has been retried and found innocent. If that be true, the district court will probably conclude that equitable relief would be inappropriate. *If Slavin is presently in prison after having been convicted, whatever controversy may exist would be between Slavin and the state official responsible for continuing his imprisonment. Under those circumstances, there would be no controversy between the judge and Slavin.* Because we do not know which of those conditions is true, we remand the claim against Judge Lindsey to the district court for further proceedings.

574 F.2d at 1264 (emphasis added).

The court thus recognized that if the state criminal proceedings had ended in Slavin's conviction, there would no longer be a controversy between Slavin and the judge. Rather, the controversy would be between Slavin and "the state official responsible for continuing his imprisonment," i.e., the warden. On petition for rehearing, the court was informed that Slavin had pled guilty to the charges alleged in the second indictment before the same state judge, who sentenced him to a term of imprisonment of two to four years. The court withdrew as moot its prior discussion of the validity of equitable relief against the judge, including the paragraph quoted above. *Slavin v. Curry,* 583 F.2d 779 (5th Cir.1978).

In withdrawing as moot that paragraph, however, the court actually reaffirmed the language describing what in fact had occurred: "If Slavin is presently in prison after having been convicted, whatever controversy may exist would be between Slavin and the state official responsible for continuing his imprisonment. Under those circumstances, there would be no controversy between the judge and Slavin." Because Slavin had been convicted and sentenced, he no longer had any controversy with the judge, and the court's prior discussion of equitable relief against the judge had been rendered moot. *Cf. Northern Virginia Women's Medical Center v. Balch,* 617 F.2d 1045, 1049 (4th Cir.1980) (holding that action against state judges for declaration that their judgments of acquittal in certain criminal cases were void did not present case or controversy because "[a] declaration on the invalidity of these judgments would have been nothing more than a gratuitous comment without any force or effect.").

As did *O'Shea* and *Slavin,* the case at bar involved a suit for equitable relief against state judges who presided over a proceeding that terminated prior to suit.[7] I agree with the reasoning the *O'Shea* and *Slavin* opinions illustrate. Once the state proceeding has ended, and there is no allegation that the petitioner may be involved in a similar

---

7. We recognize that in *Slavin* petitioner sued only one judge, whereas here Davis is suing a number of judges. Slavin did not allege that the judge who presided over his state trial acted in conformity with any judicial practice, whereas Davis does. This distinction is not relevant to our case-or-controversy analysis.

proceeding in the future, a federal declaration or injunction against a state judge serves no purpose. Just as Slavin's controversy was no longer with the judge, but with the warden, Davis' controversy was no longer with the judges, but with DHRS. It was DHRS who allegedly was depriving Davis of her constitutional rights by acting pursuant to an unconstitutional decision. Whatever constitutional deprivation may have occurred by the judge rendering the unconstitutional decision or by other judges acting under the same unconstitutional practice was no longer remediable in a suit against the judges. Thus, no controversy existed between Davis and the state judges.

The case-or-controversy problem would have been apparent at an earlier stage of the litigation had the district court recognized that Davis brought *two separate* lawsuits. These suits were based on two different statutes, brought against two different groups of defendants, claiming two different factual bases in support of relief, and asking for totally different forms of relief. The first suit was based on the habeas corpus statute; it was brought against DHRS, who had custody of the Davis child; it claimed that Davis' proceeding was rendered fundamentally unfair in violation of the due process clause because Davis was not provided counsel; and it asked for the release of the Davis child. In sharp contrast, the second suit was brought under section 1983; it was brought against the state judges only; it alleged that due process violations occur in so many cases in which indigent parents are not provided counsel that a prophylactic rule requiring the appointment of counsel in all cases is needed; and it sought the broad remedy of declaratory and injunctive relief against the state judges.

Faced with these two separate lawsuits, the district court should have separated them. Different concerns come into play in each suit. The factual basis necessary to support the first suit is narrow: evidence showing a single due process violation. In contrast, the factual basis necessary to support the second suit involves a showing of a pervasive due process violation which occurs in almost every case. Concerns of federalism, comity, and traditional notions of equity obviously play a part in the second suit but do not in the first. The error the district court made was in mistaking Davis' live case or controversy with DHRS for a live case or controversy with the judges. Had the court separated the two lawsuits as I have described, it would have become obvious to it that Davis had no case or controversy with the judges.

Based on the foregoing reasoning, I concur in the judgment of the court.

R. LANIER ANDERSON, III, Circuit Judge, concurring specially:

I concur in all of the per curiam opinion for the court except for the final footnote. Although I acknowledge the gravity of the concerns expressed there, I am not yet prepared to concur in the conclusions expressed in the final footnote of the per curiam opinion.

The application of *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), to this case presents a close and difficult issue. Although Judge Vance has articulated an intelligible distinction, I conclude ultimately that the holding and rationale of *Lassiter* require the disposition announced in the per curiam opinion I now join. While it is clear to me that due process will require counsel in most cases of this kind (unless saved by a determination that the evidence was sufficiently great "that the absence of counsel's guidance ... did not render the proceedings fundamentally unfair," *Lassiter,* 452 U.S. at 33, 101 S.Ct. at 2162), a proper reading of *Lassiter,* in my judgment, calls for a case-by-case rather than a per se approach.

RANDALL, Circuit Judge, with whom REAVLEY, Circuit Judge, joins, specially concurring:

For the reasons set forth in the Per Curiam opinion, I concur in the dismissal of the plaintiffs' section 1983 claim for failure to state a claim. I do not agree with the

unsupported statement in the Per Curiam opinion that "*Lassiter* makes any claim for class relief impossible in this case by removing the commonality of fact necessary to the maintenance of a class action," at 518, nor do I understand why the statement appears in the opinion. If it is correct, then we have no plaintiff and no case or controversy, and the dismissal of the complaint would not be a dismissal for failure to state a claim (as it is intended to be) but would instead be a dismissal for want of jurisdiction.

Finally, I think it important for this court to recognize that the Supreme Court of Florida in 1975 adopted the case-by-case approach to the right to counsel for indigent parents in Florida dependency proceedings, the approach that a majority of this court has now concluded is required by *Lassiter*. *Potvin v. Keller,* 313 So.2d 703 (Fla.1975).

GARWOOD, Circuit Judge, specially concurring:

I concur in the Court's per curiam affirmance and in Judge Tjoflat's special concurrence. With regard to the latter, I append these observations. In her brief to this Court on the original en banc submission, Davis characterized her action below, and the trial court's judgment, as follows:

"Neither her complaint nor her motion for summary judgment sought to enjoin any pending state proceeding. Rather she sought relief from *a past dependency adjudication* and *prospective relief* to assure the *appointment of counsel* in *future* dependency proceedings. The amended final judgment below does not enjoin any pending dependency proceedings; it vacates *a past adjudication* and directs the appointment of counsel in *future* adjudicatory proceedings." (Emphasis added.)

Obviously, the words "a past dependency adjudication" and "a past adjudication," refer to, and only to, the adjudication respecting the Davis child.[1]

A fair reading of Davis' complaint compels the conclusion that the habeas corpus was the only count under which relief was sought as to past dependency adjudication, and that the only such past adjudication in issue was that respecting the Davis child.[2] Likewise, it is clear that the relief which the district court ultimately granted to Davis individually was based entirely on her habeas count.[3]

1. Essentially the same position is taken by Davis in her brief to this Court following remand from the Supreme Court, viz:

   "Neither her complaint nor her motion for summary judgment sought to intrude into any pending dependency adjudicatory proceeding. Rather, she sought relief from *the* past adjudication based upon *her* right to counsel. The amended final judgment does not enjoin any pending dependency proceeding." (Emphasis added.)

2. The introductory portion of the complaint accurately characterizes it as follows:

   "Petitioner brings this action in two counts, *Count I being a petition for Writ of Habeas Corpus* seeking the release of a minor child from the custody of a social welfare agency of the State of Florida. *The child's natural mother is seeking to invalidate a state court judgment adjudicating her child dependent because, though she was indigent, she was not provided counsel to represent her in the dependency action* wherein she was deprived of the custody of her child. The mother contends that it is a violation of her constitutional right to due process of law and equal protection under the law for the state to

   interfere with her fundamental right to the care, control, and custody of her natural child, without affording her counsel, if she is indigent, to represent her in such proceedings. *Count II of this complaint is a class action* brought against the Juvenile Court Judges of Dade County, Florida to declare unconstitutional the practice and policy in the Juvenile Court of conducting dependency proceedings against indigent parents without providing them counsel at the state's expense. Petitioner on behalf of herself and all others similarly situated further seeks to enjoin said practice and policy." (Emphasis added.)

3. This is clear from the district court's opinion. See *Davis v. Page,* 442 F.Supp. 258, 259 n. 1 and accompanying text (S.D.Fla.1977):

   "In a separate count, Plaintiff seeks a writ of habeas corpus to secure the release of her child from the continuing supervision by the Florida Department of Health and Rehabilitative Services under the continuing jurisdiction of the Dade County Circuit Court.[1]

   "[1] Plaintiff originally sought restoration of custody. However, during the course of

Accordingly, it is proper to regard count two, the class action count and the sole count which is before us, as pertaining only to future dependency proceedings, which is the way Davis characterizes it and the relief granted pursuant to it. This is particularly appropriate because with regard to concluded proceedings *res judicata* would bar relief (except pursuant to habeas corpus, were it otherwise available), *see Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), and with regard to pending proceedings relief would be barred by abstention. *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979).

I agree with Judge Tjoflat, for the reasons so well set forth in his concurring opinion, that Davis was not a proper class representative and that as to past adjudications the judges were not proper defendants. I am also of the opinion that a "class" of parents who might while indigent at some later time be the subject of future dependency proceedings brought in Dade County, and for whom the courts would not appoint counsel though counsel were to be needed, desired, and otherwise unavailable, is simply too indefinite to present a case or controversy appropriate for the exercise of federal judicial power under Article III. Such a class is not sufficiently definable, for purposes of the characteristics that are relevant to distinguishing it from the population generally, by reference to existing facts. It thus differs not only from classes defined by immutable characteristics, such as race or sex, but also from those defined by current conditions, such as those who at the time of suit in fact reside in a state and then desire to procure a divorce in its courts but have not lived there long enough to fulfill a one-year residency requirement. *See Sonsa v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Unlike those instances, here one cannot at the time of suit confidently identify even some presently existing individuals who are members of such a "class."[4] *See e.g., Thomas v. Clarke,* 54 F.R.D. 245, 249 (D.Minn.1971) (three-judge court); *Cunningham v. Ellington,* 323 F.Supp. 1072, 1074 (W.D.Tenn.1971) (three-judge court); *Rappaport v. Katz,* 62 F.R.D. 512, 514 (S.D.N.Y.1974); *Lamb v. Hamblin,* 57 F.R.D. 58, 60 (D.Minn.1972).

Accordingly, I join in Judge Tjoflat's special concurrence, and would additionally reach the same result because there is, in my view, no proper class in respect to count two. I also join in the per curiam affirmance, particularly in light of the considerations expressed in the footnote to that opinion.

VANCE, Circuit Judge, with whom GODBOLD, Chief Judge, TUTTLE, RUBIN, KRAVITCH, FRANK M. JOHNSON, JR., POLITZ, TATE, THOMAS A. CLARK and WILLIAMS, Circuit Judges, join, dissenting:

I respectfully dissent from the majority's reversal of the district court's judgment and remand for entry of judgment for defendants.[1]

these proceedings, custody was restored to her subject to supervision by the state and the continuing jurisdiction of the Circuit Court. The plaintiff's child is still 'in custody'. See *Jones v. Cunningham,* 371 U.S. 236 [83 S.Ct. 373, 9 L.Ed.2d 285] (1963). See also *Carafas v. LaVallee,* 391 U.S. 234 [88 S.Ct. 1556, 20 L.Ed.2d 554] (1968); *Hensley v. Municipal Court,* 411 U.S. 345 [93 S.Ct. 1571, 36 L.Ed.2d 294] (1973)."

4. Even if the "class" included those who had been subjects of dependency proceedings, respecting such class members the judges were not proper defendants, as Judge Tjoflat's concurring opinion points out. Moreover, if the "prospective" class forms an inappropriate basis for exercise of case or controversy federal judicial power under Article III, this result should not be changed by expansion of the class definition to include those who under settled judicial doctrines of *res judicata* and abstention are not entitled to relief. Particularly is this so where, as here, the class relief sought and granted was entirely prospective and for the benefit of the future "class."

1. In the body of my dissent I undertake to address the merits of the question before us. I should point out, however, that the conclusion of the majority that there is an absence of the commonality requirement of Fed.R.Civ.P. 23(a)(2) is based upon faulty logic. First, Davis had an individual claim. The record does not

In our previous en banc opinion in this case, *Davis v. Page,* 640 F.2d 599, 601, 602 (5th Cir.1981) (en banc) we held that jurisdiction as to Davis' claim against the judges of the Florida state courts was properly founded on both federal habeas corpus, 28 U.S.C. § 2254, and 42 U.S.C. § 1983. The Supreme Court vacated and remanded to us for consideration in the light of *Lehman v. Lycoming County Children's Services Agency,* 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). In *Lehman,* the Court held that federal habeas corpus jurisdiction under section 2254 could not be invoked to challenge the constitutionality of a state statute under which a state had obtained custody of children and had terminated involuntarily the parental rights of the natural parent. If we narrowly read the Supreme Court's charge to us in this case, we now would be constrained to find that our original holding remains valid and intact under the alternative jurisdictional base of section 1983.

We would be remiss in our responsibilities, however, if we did not also recognize that in the interim between our first en banc opinion and the Supreme Court remand the Supreme Court also decided *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). The *Lassiter* opinion, holding that counsel is not constitutionally required in North Carolina termination of parental rights proceedings, bears heavily on the substantive issue in this case. The *Lassiter* opinion, in effect, forces us to reconsider our substantive as well as our jurisdictional holding on this remand.[2]

support the parsing of the pleadings in the rigid manner the majority opinion adopts. Count II of the complaint adopts all of the allegations of Count I. The complaint also contains a prayer for general relief without reference to any count. It was under the general prayer that the dependency adjudication was declared null and void. Second, when the class was certified by the district court, the common question presented was whether appointment of counsel to indigent parents in Florida dependency proceedings was required by the due process clause of the fourteenth amendment. As a result of the *Lassiter* decision, the issue has been narrowed and focused, so that, as the majority opinion recognizes, the common class question before us is, in effect, whether, under the balancing test established in *Lassiter,* appointment of counsel is constitutionally required under the due process class. *Lassiter* has sharpened the focus of the issue. But it has by no means nullified it.

2. In his special concurrence, Judge Tjoflat reasons that Davis' claim against the judges never presented a live case or controversy because the dependency proceedings were concluded prior to the initiation of this action. This view was rejected by a majority of this court during conference.

It is true that while the case was pending in district court, the Florida state court returned Carl Thor to his mother's physical custody, granting Ms. Davis relief in her claim against the DHRS. But this only partially ameliorated the injury for which she sought relief. Under the state court order, Carl Thor remained subject to the state judge's judgment and retention of jurisdiction (in effect legal custody). Legal custody was transferred back to Ms. Davis

from the Florida courts only through the declaratory judgment of the district court. The state court judges were clearly proper defendants to this action, because it was the court alone, not the DHRS, which had legal custody. Davis thus had a live claim against the judges at the time of her action in district court. This case is, therefore, obviously different from *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Slavin v. Curry,* 574 F.2d 1256, *modified,* 583 F.2d 779 (5th Cir. 1978), and the other cases relied on by Judge Tjoflat, in which the alleged injury was past and the possibility of future injury purely speculative.

Despite Judge Tjoflat's contrary view, the *Sosna* requirements have been fully complied with in this case. In *Sosna v. Iowa,* 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975), the Supreme Court considered a situation identical to this one in its essential elements. A Fed.R.Civ.P. 23(b)(2) class action was brought, requesting declaratory and injunctive relief prohibiting judges of the state courts of Iowa from acting pursuant to an allegedly unconstitutional state statute. By the time of appellate review, the individual claim of the named plaintiff had become moot. The Court held that:

There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23, but there must be a live controversy at the time this Court reviews the case .... *The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot.*

In *Lassiter* the Supreme Court applied a balancing test, based upon the three pronged test of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine whether counsel is constitutionally required in civil proceedings impinging upon parental rights.

The case of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.

*Lassiter v. Department of Social Services,* 452 U.S. at 28, 101 S.Ct. at 2160. We now apply the *Lassiter* test to Florida dependency proceedings.

The Florida statutory scheme involved in this case is virtually identical to that which governs state proceedings to intervene in the parent-child relationship in most other states. In Florida, as is typical of other states, these proceedings are divided into two stages.

The first or adjudicatory stage, that described by the Supreme Court in the post-*Lassiter* case of *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), is a formal trial. The issue at trial is the fitness of the parent, and therefore the parent's right to custody. Once adjudicated, this decision has full res judicata effect. Rules of evidence apply, witnesses are examined and cross-examined, the state is represented by legal counsel, and, by statute in most states, the parent has a right to appointed counsel. Plaintiffs in this case contend that Florida parents also have a right to counsel in these adjudicatory proceedings under the due process clause of the United States Constitution.

The second stage of these proceedings is the dispositional stage. It is generally informal in nature, like an administrative hearing. Although a parent may come to these proceedings at a disadvantage because of a prior adjudication of unfitness, no question of parental fitness or of a constitutional right to custody is involved. Rather, the main issue is what placement will be in the best interests of the child. It is this second, dispositional stage of the proceeding at which the *Lassiter* Court determined that counsel is not constitutionally required.

The difference between the adjudicatory and dispositional stages of these proceedings is critical to the constitutional issue in this case.

*Id.* at 402, 95 S.Ct. at 559 (emphasis added). *Accord Franks v. Bowman Transp. Co.,* 424 U.S. 747, 752–57, 96 S.Ct. 1251, 1258–60, 47 L.Ed.2d 444 (1976). In a class action dismissal is appropriate only where, as in *O'Shea v. Littleton,* the controversy is moot as to all class members.

In this case the complaint was filed on June 22, 1976 and the class was certified on December 22, 1976, prior to both the order of the Florida circuit court returning Carl to the physical care of his mother under the continuing jurisdiction of the Florida circuit courts on January 28, 1977, and the judgment of the federal district court, declaring the adjudication of dependency to be null and void, on January 25, 1978. The controversy remains live as to thousands of other members of the class who are routinely denied counsel.

The Supreme Court has interpreted *Sosna* as establishing a substantive principle for determining case and controversy requirements in Rule 23(b)(2) class actions, not merely a formalistic chronological requirement. "*Sosna* contemplates that mootness turns on whether, in the specific circumstances of the given case at the time it is before [the court], an adversary relationship [exists] sufficient to fulfill" the purposes of the personal stake prong of the Article III case and controversy requirement. *Franks v. Bowman Transp. Co.,* 424 U.S. at 755–56, 96 S.Ct. at 1259–60. "[T]he purpose of the 'personal stake' requirement is to assure that the case is in a form capable of judicial resolution. The imperatives are ... sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 403, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980). In the case before us, the fundamental Article III factors are amply met.

### The Private Interest

Parents have a fundamental constitutional right to "bring up children," *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1922), to retain custody of their children, and to raise them as they see fit. The Supreme Court has stated "It is cardinal with us that the custody, care and nurture of the child reside first in the parents whose primary function and freedom include preparation for obligations the state can neither supply nor hinder," *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The constitutional rights of a parent are not limited to physical custody of a child. They include the right to "direct his destiny" and "the liberty . . . to direct [his] upbringing and education." *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). They include the right to make decisions about his care and education, whether or not these deviate from the cultural norm. *See, e.g., Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters.* As the Supreme Court recently emphasized in the post-*Lassiter* case of *Santosky v. Kramer,* 455 U.S. at 753, 102 S.Ct. at 1394:

> [F]reedom of *personal choice in matters of family life* is a fundamental liberty . . . . Natural parents have a fundamental liberty interest . . . in the care, custody, and *management* of their child.

(emphasis added). In addition, "The law's concept of the family [has] . . . historically . . . recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.,* 442 U.S. at 602, 99 S.Ct. at 2504.

As a consequence of the dependency adjudication in the State of Florida, the parents' right to custody, the right to freely decide how the child will be raised, and the legal assumption that such decisions will be in the child's best interest, are destroyed. When a child is adjudicated dependent in the State of Florida, the fundamental familial bond is severed, the child becomes a ward of the courts, and the rights of the parent are permanently "forfeited" to the courts of Florida. *Pendarvis v. State,* 104 So.2d 651, 652 (Fla.1958) (*Pendarvis I*). Once the court obtains jurisdiction of a dependent child, the jurisdiction continues unabated, unless relinquished by court order, until the child reaches eighteen years of age. Fla.Stat.Ann. § 39.40 (West 1983). The court may remove the child from the parental home and place him in the care of those whom it finds more suitable. *Id.* at § 39.41 (West 1983). In *Pendarvis I,* 104 So.2d at 652, the Florida Supreme Court emphatically described the death blow dealt to parental rights by an adjudication of dependency:

> Once a child has been lawfully declared to be a dependent or delinquent child, it becomes a ward of the state and a broad discretion is vested in the juvenile court to do those things which appear to be in the best interest of the child.

As a matter of course such adjudication frequently results, as it did here, in the immediate physical removal of a child from his parents' custody. The courts exercise this discretion, however, even when a dependent child is allowed to remain in the parental home. In such circumstances the child is virtually paroled to the parent under the court's "protective supervision." Fla.Stat.Ann. § 39.41(1)(a). Until the child reaches legal majority he or she may live with the parent only at the discretion and sufferance of the Florida courts, and only under the conditions they prescribe. *Id.* At any time, by petition of *any* interested person, and without the need for further adjudicatory proceedings, or any evaluation of parental fitness, the child may be removed from the parent's home, if the court determines, after an informal hearing, that such is in the child's best interest. *Id.* at § 39.41(1)(e). The parent's custody of the child may be questioned and interrupted at any time by administrative type hearings. Although the parent may participate in those hearings to retain custody, the parent will be forced to prove by a preponderance of the evidence that continued custody is in the child's best interest. *Id.* at §§ 39.408(2)

and 39.41. Even in circumstances where active court supervision is at a minimum the spectre of judicial interference places a lasting chill on the exercise of fundamental parental rights.

Despite its recognition of the "commanding" interests of parents, the majority concludes, on the basis of *Lassiter,* that these interests are insufficient to overcome the presumption against a right to counsel. The parental interest involved in dependency proceedings, however, is different from and greater than that involved in the termination proceedings at issue in *Lassiter.* First, unlike termination proceedings, which place the final formal attestation on long severed domestic and emotional bonds, dependency proceedings are an initial state interference into an intact familial unit. The strength of parental rights is at its pinnacle when parent and child dwell together in an intact domestic unit. As the Supreme Court observed in *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), the "integrity of the family unit" has found protection in the due process clause of the fourteenth amendment, *Meyer v. Nebraska,* 262 U.S. at 399, 43 S.Ct. at 626, the equal protection clause of the fourteenth amendment, *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and the ninth amendment, *Griswold v. Connecticut,* 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring). The *intact* family unit is accorded the additional protection of the right to privacy which derives from the first, third, fourth, fifth and ninth amendments. *See Griswold v. Connecticut,* 381 U.S. at 484–85, 85 S.Ct. at 1681–82. The Supreme Court has recognized the difference between the rights of parents who reside with their children and those who do not. *Compare Stanley v. Illinois* (holding that unwed widowed fathers who live with their children have a due process right to a hearing before the children may be removed from their custody) *with Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (holding that unwed fathers who do not reside with their children have no constitutional right to withhold consent to their adoption by resident stepfathers). Once children are removed from the natal home, the rights of natural parents compete with those of parent surrogates. *Smith v. Organization of Foster Families,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).

Second, in contrast to the termination proceeding, the dependency proceeding is the critical stage in the adjudication of parental rights because it is the only point at which the issue of parental *fitness* is litigated and is dispositive. As the Florida Supreme Court stated in *Pendarvis I:*

> Evidence that may be totally inadequate to deprive a parent of the custody of his child in the first instance may be altogether adequate to support the court's refusal to restore custody to the parent once the child has become a ward of the state.

104 So.2d at 652.

A preeminent principle which emerges from our review of the right to counsel cases decided by the Supreme Court is that, when fundamental liberty interests are involved, counsel is generally mandatory at the "adjudicatory" stage and discretionary at the "dispositional" stage. For example, in *In re Gault,* 387 U.S. 1, 31 n. 48, 87 S.Ct. 1428, 1445 n. 48, 18 L.Ed.2d 527 (1967), extending the right to counsel to juvenile delinquency proceedings, the Court stated "[W]hat we hold in this opinion with regard to procedural requirements at the adjudicatory stage has no necessary applicability to other steps of the juvenile process."

The basis for the distinction is illuminated by comparison of the Court's opinions in *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) and *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). In *Mempa* the Court found a *per se* right to counsel at combined probation revocation and sentencing proceedings. The Court explained:

> *Townsend* [*v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690], *Moore,* and *Hamilton* [*v. State of Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114] . . . clear-

ly stand for the proposition that appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected .... Even more important in a case such as this is the fact that certain legal rights may be lost if not exercised at this stage. *Id.,* 389 U.S. at 134–35, 88 S.Ct. at 256–57. By contrast, in *Gagnon* the Court found that the right to counsel must be determined on a case-by-case basis at proceedings for purposes of probation revocation only. The Court found that such proceedings were "not a part of a criminal prosecution," 411 U.S. at 781, 93 S.Ct. at 1759. Rather, they were informal dispositional proceedings through which a placement was made on the basis of rights and interests previously adjudicated. The fact that *Mempa* and *Gagnon* are criminal proceedings while termination and dependency proceedings are civil is not controlling because the right to counsel derives from the due process clause as well as the sixth amendment. *In re Gault,* 387 U.S. at 20, 87 S.Ct. at 1439.

In *Lassiter,* the Supreme Court extended the reasoning of *Gagnon* to a civil context, holding that the right to counsel at termination proceedings must be decided on a case-by-case basis. Like the probation revocation proceedings in *Gagnon,* the North Carolina termination proceedings in *Lassiter* are essentially dispositional. In many states such proceedings are actually called "dispositional" proceedings. Permanent custody of the child is awarded in the manner determined to be in the child's best interest. As the Florida Supreme Court described the comparable proceeding in *Pendarvis II,* 115 So.2d 81, 82 (Fla. 1st DCA 1959):

> [T]he factors to be considered by the Juvenile Judge necessarily include: the age of the child, the periods of time he has spent with his natural parents, at institutions, and with foster parents, the effect of removing him from his foster home, and the affection, economic and psychological well-being, and cultural advantages which he can reasonably anticipate from his foster parents.

No fundamental liberty interest of the parent is adjudicated at termination proceedings because the fundamental right to the care and custody of one's children has already been adjudicated and lost at the earlier proceeding where the parent has been adjudged unfit.

Just as *Lassiter* is analogous to *Gagnon,* Davis is analogous to *Mempa* and to *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The dependency proceeding is the critical stage at which the substantive issue of fitness, upon which the parental right to custody depends, is adjudicated. Once severed or stigmatized, the presumption can never be regained—despite a subsequent showing that the parent is fit.

### The Government Interest

As the Supreme Court recognized in *Santosky v. Kramer,* 455 U.S. at 766, 102 S.Ct. at 1401:

> Two state interests are at stake in parental rights ... proceedings—a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings.

The interest of the state as *parens patriae* is identical to the interest of the child. Children have a fundamental need for stable environments and human relationships. "To safeguard the right of parents to raise their children as they see fit, free of government intrusion, except in cases of neglect and abandonment, is to safeguard each child's need for continuity." Goldstein, J., A. Freud and A. Solnit, Beyond the Best Interests of the Child 7 (1979). "So long as a child is a member of a functioning family, his paramount interest lies in the preservation of his family." Goldstein, J., A. Freud and A. Solnit, Before the Best Interests of the Child 5 (1973). Therefore, the interest of the state as *parens patriae* at a termination proceeding where the state seeks to permanently separate a child from a parent already formally adjudicated unfit

is opposite to its interest at a dependency proceeding where a valid determination of parent fitness is crucial to deciding what is in the child's, and thus the state's, best interest. "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents. Indeed, if [the parent is fit] the State spites its own articulated goals when it needlessly separates [the child] from his family." *Stanley v. Illinois,* 405 U.S. at 652–53, 92 S.Ct. at 1213. The difference between the *parens patriae* interest at dependency proceedings and at termination proceedings was clearly stated by the Supreme Court in *Santosky:*

> [W]hile there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not severance, of natural familial bonds....
>
> The State's interest in finding the child an alternative permanent home arises only "when it is *clear* that the natural parent cannot or will not provide a normal family home for the child." At the factfinding, the goal is served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home.

455 U.S. 766–67, 102 S.Ct. at 1401, *quoting* N.Y.McKinney's Social Service Law § 384–b.1.(a)(iv) (emphasis added).

Against the strong interest of the state as *parens patriae* in providing counsel at dependency proceedings must be balanced the state's relatively weaker fiscal and administrative interest in inexpensive, expeditious proceedings.

### The Risk of Erroneous Results

As the *Lassiter* Court employed the *Mathews v. Eldridge* calculus, the unlikelihood that the procedures used in North Carolina termination proceedings would lead to erroneous decisions weighed particularly heavily in the decision against a *per se* right to counsel. The Court emphasized that: (1) the termination proceedings are informal and do not employ the rules of evidence; (2) the state is frequently unrep-

resented by counsel; (3) no difficult or troublesome points of substantive or procedural law are involved; and (4) the termination proceeding is the final step in a series including dependency and neglect proceedings at which the mother has the right to appointed counsel under state law. *Lassiter v. Department of Social Services,* 452 U.S. at 29–31, 101 S.Ct. at 2160–2161.

The factors evaluated by the *Lassiter* Court were derived from those used to determine the right to counsel in criminal proceedings. Thus, in *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), *Mempa v. Rhay* and *Gideon v. Wainwright* the Court held that criminal defendants had a right to counsel because substantive rights were adjudicated in a formal adversarial context. By contrast, in *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Court held that the right to counsel in parole revocation hearings should be determined on a case-by-case basis because there is no *de novo* determination of rights and the proceedings are informal and nonadversarial.

It is clear, when these factors are applied to Florida dependency proceedings, that the risk of erroneous results is comparable to that in the *Gideon-Argersinger* line of cases and dispositively different from that of *Gagnon* and *Lassiter.* Under Florida law, an adjudicatory proceeding in which the state seeks prolonged or indefinite custody is a formal accusatory proceeding in which the state must prove that a parent has abandoned, abused or neglected a child. The state is always represented by counsel, Fla.Stat.Ann. § 39.404(3) (West 1983). Formal rules of evidence are employed. *Id.* at § 39.408(1)(b). By a recent Florida Supreme Court ruling, 418 So.2d 1004 (Fla. 1982), Rule 8.300 of the Florida Rules of Juvenile Procedure has been amended to require the appointment of a guardian *ad litem* to represent the child in all abuse and neglect proceedings. Thus, every interest but the parent's is now represented by counsel. The issue of fitness is a subtle and difficult question of law. A fitness determination involves not only sensitive factual

determinations but legal judgments on the meaning of psychological, sociological and medical conclusions drawn from these facts. The issues which may be adjudicated are speculative and far reaching. *See In re J.L.P.,* 416 So.2d 1250 (Fla. 4th DCA 1982) (holding that an adjudication of dependency can rest solely upon evidence that a parent is likely to abuse or neglect a child, even though the parent has never done so).

The unfairness which besets an unrepresented mother in dependency proceedings was well summarized in our initial panel opinion in this case:

> The dependency proceeding is complex in terms of the procedural, evidentiary and substantive law applicable to the hearing. In addition to this confusing legal framework, the parent is confronted with "the full panoply of the traditional weapons of the state." The state is represented by the state attorney; it has access to public records concerning the family and to the services of social workers, psychiatrists and psychologists. Those representing the state have experience in legal proceedings and the ability to examine witnesses, present evidence, and argue skillfully that the child should be adjudicated dependent. Unrepresented parents, in contrast, will normally not cross-examine witnesses, submit evidence, call witnesses, or present a defense. They do not understand the rules of procedure or substantive law .... [T]hey may not even understand the legal significance and effect of the proceedings.

*Davis v. Page,* 618 F.2d 374, 380–81 (5th Cir.1980). Because parents subject to dependency proceedings "are often poor, uneducated, or members of minority groups, such proceedings are often vulnerable to judgments based on cultural or class bias." *Santosky v. Kramer,* 455 U.S. at 763, 102 S.Ct. at 1399 (citation omitted). *Accord Smith v. Organization of Foster Families,* 431 U.S. at 833–35, 97 S.Ct. at 2103–04.

The dangers of erroneous results are not merely hypothetical. Unrepresented parents lose custody of their children significantly more often than parents represented by counsel. *See* Schecter, Lowell, F., The Pitfalls of Timidity: The Ramifications of *Lassiter v. Department of Social Services,* 8 No.Ky.L.Rev. 435 (1981); Note, Representation in Child-Neglect Cases: Are Parents Neglected? 4 Col.J. of L. and Soc.Prob. 230 (1968).

The consequences of erroneous determinations are illustrated by the facts of this case.

At no time did Hilary Davis show a hint of unfitness or inadequacy as a mother. Rather, she suffered an adjudication of dependency because of rational and sensible efforts she made to protect and raise her son.

On January 30, 1976, Hilary Davis' husband beat fourteen month old Carl Thor until he broke the baby's arm. Ms. Davis immediately took her son to the hospital where she spent the night with him. Determined to leave her husband because of his violence towards Carl, Ms. Davis turned to the state for help. Because she was indigent and separated from her husband Ms. Davis would have qualified for financial assistance and medical care under the AFDC program.

Instead, the state responded on February 4, 1976 by initiating a dependency proceeding to remove Carl from his mother's custody. At an initial hearing later that same day, the state court entered an order releasing Carl from the hospital into state custody pending a formal adjudicatory hearing on March 4, 1976. Hilary Davis attended the hearing without counsel. The judge did not offer to appoint counsel for her, but suggested she obtain counsel for the adjudicatory hearing.

Hilary Davis was poor and thus unable to retain private counsel. Recognizing her need for legal assistance, she tried repeatedly to secure the services of an attorney employed by Legal Services of Greater Miami, Inc. She was unable to get a lawyer and had to appear at the dependency proceeding without counsel. The miscarriage of justice which ensued is well described in the district court opinion.

Without benefit of counsel, Hilary Davis was little more than a spectator in the adjudicatory proceeding. She was ignorant of the law of evidence, and of the substantive law governing dependency proceedings. She sat silently through most of the hearing, and fearful of antagonizing the social workers, reluctantly consented to what she believed would be the placement of her child with the state for a few weeks.

... Carl Thor Davis was adjudicated dependent, committed to temporary custody of the Department of Health and Rehabilitative Services pursuant to Fla. Stat.Sec. 39.10(4) and Sec. 39.11(1)(c). At the conclusion of the hearing, the Court told Hilary Davis to contact a lawyer. She was not advised of her right under Fla.Stat. Sec. 39.14(1) to appeal from the adjudication of dependency.

442 F.Supp. at 260–61. Hilary Davis lost custody of Carl not because she was an unfit parent but because she was poor and innocent of the subtleties of legal proceedings.

Florida asserts that it considers providing counsel to indigents such as Davis on a case-by-case basis. *See In re D.B.,* 385 So.2d 83, 90–91 (Fla.1980). But counsel is routinely denied to thousands of indigent parents involved in dependency proceedings. Defendants admitted in the original pleadings in this case that it was the policy and practice of Dade County circuit judges to conduct dependency proceedings without appointing counsel for indigent parents.

Resolution of this factual conflict is unnecessary in my view because of the constitutional deficiency of the claimed case-by-case consideration, as is so poignantly demonstrated by this case.

To me, the fundamental parental interest involved, the strong interest of the state as *parens patriae* compared to its relatively weak fiscal and administrative interest, and the great risk of erroneous results, would seem to mandate under the test applied in *Lassiter* a *per se* right to counsel in Florida dependency proceedings. That the majority reaches a different result may be due to

the extremely broad language of Justice Blackmun's *Lassiter* dissent. The characterizations of the North Carolina termination proceedings in the majority and dissenting opinions are hard to reconcile. While the majority opinion stresses the informality of the proceedings the dissent describes them as resembling "in many respects a criminal prosecution," *Lassiter v. Department of Social Services,* 452 U.S. at 43, 101 S.Ct. at 2168, "distinctly formal and adversarial," *id.,* having "virtually all the attributes of a formal trial," *id.* at 45, 101 S.Ct. at 2169, and "clearly adversarial and punitive," *id.* at 49, 101 S.Ct. at 2171. While the majority opinion notes the absence of "specially troublesome points of law, either procedural or substantive," *id.* at 32, 101 S.Ct. at 2162, the dissent describes these same proceedings as "quintessentially legal," *id.* at 44, 101 S.Ct. at 2168, and posing legal issues that "are neither simple nor easily defined" with standards that are "imprecise and open to the subjective values of the judge." *Id.* at 45, 101 S.Ct. at 2169. While the majority emphasizes that the state is often unrepresented by counsel, *id.* at 29, 101 S.Ct. at 2160, the dissent states that "The State has legal representation through the county attorney .... And, of course, the State's counsel himself is an expert in the legal standards and techniques employed at the termination proceeding." *Id.* at 43, 101 S.Ct. at 2168.

These descriptions are disturbingly incongruent. But the law to which they relate is clearer. In civil proceedings infringing severely upon fundamental parental rights, the degree to which the formal adversarial nature of the proceeding increases the risk of erroneous results is determinative of the right to counsel issue. We should not decide this case by comparing Florida dependency proceedings with the functionally dissimilar North Carolina termination proceedings. Rather, we should apply the *Lassiter* rationale to the Florida proceedings before us and determine whether, in the absence of counsel, they create a constitutionally significant risk of erroneous results.

In *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), decided subsequent to *Lassiter,* the Supreme Court reviewed the factfinding stage of New York state permanent neglect proceedings which are identical to Florida dependency proceedings in the following aspects. The state is directly pitted against the parent, marshalling an array of public resources to prove that the parents are unfit to raise their own children. The proceeding bears many of the indicia of a criminal trial, is conducted pursuant to the formal rules of evidence, and involves the examination and cross-examination of witnesses. The Court concluded, as I conclude now, that "At such a proceeding numerous factors combine to magnify the risk of erroneous factfinding." *Id.* at 762, *id.* at 1399.

Right to counsel was not considered in *Santosky* because parents have a statutory right to counsel under New York law. Similarly, in North Carolina parents have a statutory right to counsel at the critical fitness determination proceedings which precede the termination proceedings at issue in *Lassiter.* *Lassiter v. Department of Social Services,* 452 U.S. at 43 n. 10, 101 S.Ct. at 2168 n. 10. It is error to unduly consider the details of Florida dependency procedures at the sacrifice of their substance. In a long line of decisions the Supreme Court has enunciated a critical distinction. Due process requires the appointment of counsel in proceedings entailing substantive adjudications of fundamental liberty interests. *See Argersinger v. Hamlin; Gideon v. Wainwright.* But proceedings which merely involve placement on the basis of previous substantive adjudications require counsel only where, under the specific facts of the case, lack of counsel would be fundamentally unfair. *See Gagnon v. Scarpelli.* While the *Lassiter* proceedings belong in the latter category, the proceedings at issue here belong in the former. The majority's conclusion that *Lassiter* controls is incorrect because dependency and termination proceedings are different in kind as well as in degree.

Upon reconsideration I would reinstate the prior en banc judgment.